MASSACHUSETTS INSURERS INSOLVENCY FUND *vs.*
CONTINENTAL CASUALTY COMPANY & others.[1]

Suffolk.   December 3, 1986. — April 13, 1987.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Massachusetts Insurers Insolvency Fund. Insurance*, Insolvency of insurer,
    Liability insurance, Coverage, Construction of policy. *Contract*, Insur-
    ance.

An excess liability insurance policy that stated without limitation that its
    coverage dropped down when the underlying coverage was reduced
    provided first dollar coverage when the primary insurer became insolvent
    and unable to make any payment on a claim. [599-602] O'CONNOR, J.,
    dissenting.

CIVIL ACTION commenced in the Superior Court Department
on March 15, 1982.

The case was heard by *Chris Byron*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Carol A. Kelly* for Continental Casualty Company.

*David D. Dowd* for the plaintiff.

WILKINS, J.   The case is one of two we decide today concern-
ing the consequences to an apparent excess insurer of the insol-
vency of the underlying insurer. See *Gulezian* v. *Lincoln Ins.
Co., post* 606 (1987).

In January, 1977, Irene Reilly allegedly sustained personal
injuries as a result of a fall on premises owned by Roy Farr.
The Reillys commenced a tort action against Farr in the Superior
Court in Essex County. Farr had primary insurance covering
the claim in the amount of $300,000 with Reserve Insurance
Company (Reserve) and umbrella excess third-party liability
insurance coverage (from $300,000 to $5,000,000) with Con-

---

[1] The other defendants are Irene and John Reilly and Roy Farr, trustee.

tinental Casualty Company (Continental). In May, 1979, Reserve was declared insolvent and, pursuant to G. L. c. 175D (1984 ed.), the Massachusetts Insurers Insolvency Fund (Fund) took over the defense of the claim.

In this action, commenced in March, 1982, the Fund seeks a determination that it is not liable for any judgment in the Essex County tort case, that Continental will be liable to satisfy any judgment in that action, and that Continental is obliged to take over defense of that action. The case was submitted on cross motions for summary judgment. The Fund and Continental agree that, if Continental's insurance policy provides first dollar coverage in the event of the insolvency of the primary insurer, Continental and not the Fund is obliged to satisfy any judgment in the tort action, up to the limits of Continental's coverage.

The judge ordered the entry of a judgment in favor of the Fund which declared that the Fund is not liable for any judgment against Farr in the Essex County tort action and that Continental is so liable up to the limit of its coverage. He based his decision on what he concluded was ambiguous policy language which he ruled should be read in favor of the insured (and thus the Fund) to provide first dollar coverage by Continental. Continental appealed, and we allowed the Fund's application for direct appellate review. We need not accept all the judge's reasoning to conclude that the judgment should be affirmed.

The Continental policy in part provided as to its liability over primary coverage that it "will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule." The schedule provided for underlying coverage for general liability, automobile liability, and employers' liability insurance to various dollar limits of coverage.[2]

---

[2] We need not decide whether the motion judge was correct in concluding that the words "applicable limits of liability" were ambiguous and thus permitted the word "applicable" to mean "collectible" at the time of judgment. We do consider the question in the context of a different policy in *Gulezian* v. *Lincoln Ins. Co., supra* at 608-612.

If an excess policy provides that underlying coverage has to be collectible or recoverable at the time of judgment, the lower limit of the excess coverage

The Continental policy provides further that, if the underlying limit of liability has been "reduced," the policy becomes excess of that reduced limit.[3] Thus, if the underlying coverage is reduced to nothing, the excess policy in effect provides first dollar coverage. Was there at least an ambiguity as to whether the insolvency of the underlying insurer would cause the aggregate limit of the underlying insurance to be "reduced"? The motion judge thought so, and we agree. The policy is ambiguous as to whether the excess insurer will step in when the underlying coverage becomes unavailable due to the primary insurer's insolvency. On traditional analysis, such an ambiguity must be construed against the insurance company. See *Cody* v. *Connecticut General Life Ins. Co.*, 387 Mass. 142, 146 (1982); *August A. Busch & Co. of Mass., Inc.* v. *Liberty Mut. Ins. Co.*, 339 Mass. 239, 243 (1959), and cases cited.

In terms of what a reasonable insured might conclude looking at its insurance policy, a matter of a hypothetical insured's reasonable expectations,[4] the clearest fact is that the policy does not explicitly confront the consequences of the insolvency of the underlying insurer. An insurance company no doubt would view the amount of the underlying coverage as a kind of deductible amount assumed by the policyholder in all circumstances. On the other hand, if a reasonable policyholder thought about the subject at all, it probably would have assumed

---

drops down if the primary insurer becomes insolvent. See *Reserve Ins. Co.* v. *Pisciotta*, 30 Cal. 3d 800, 815 (1982); *Donald B. MacNeal, Inc.* v. *Interstate Fire & Casualty Co.*, 132 Ill. App. 3d 564, 567-568 (1985); *Gros* v. *Houston Fire & Casualty Ins. Co.*, 195 So. 2d 674, 676 (La. App. 1967).

[3] The policy language is: "With respect to [excess liability indemnity], if the applicable limit of liability of the underlying insurance is less than as stated in the schedule of underlying insurance because the aggregate limit of liability of the underlying insurance has been *reduced* this policy becomes excess of such reduced limit of liability" (emphasis supplied).

[4] We have taken note of the concept of an insured's objectively reasonable expectations as a possible guide to the determination of an insured's rights under an insurance policy. See *Home Indem. Ins. Co.* v. *Merchants Distribs., Inc.*, 396 Mass. 103, 107 (1985), and cases cited. There is no need to rely on that concept in this case where the policy is conspicuously ambiguous.

that the excess insurer would step into the void whenever, for whatever reason, the primary insurance company could not or would not meet its policy obligations. The result because of the ambiguity, or, if one prefers, because of the reasonable expectations of a policyholder looking at the policy, is that a reduction in the limit of the underlying coverage includes a reduction due to the financial failure of the primary insurer.

Continental argues that the reduction of the limit of the underlying coverage must refer only to a reduction due to payment of a loss or losses. Its excess policy required the insured to maintain the policies listed in the schedule of underlying insurance (or other policies no more restrictive) during the pendency of the policy "except for any reduction of the aggregate limits of liability in the underlying insurance because of injury or destruction." In this policy language the cause of the reduction in the aggregate limits of liability is stated, namely, losses paid by the appropriate primary insurance. On the other hand, as noted above, when stating that the excess policy drops down to become excess of any reduced limit of liability, the policy does not restrict or define the causes of the reduction. The difference in the language concerning reduction of coverage is fatal to Continental's argument.

A number of cases have held that, if an excess policy says it will drop down when there has been a reduction or exhaustion in the primary coverage due to the payment of losses, the excess policy does not drop down when the primary coverage is reduced or exhausted due to the insolvency of the primary insurer. See *Mission Nat'l Ins. Co.* v. *Duke Transp. Co.*, 792 F.2d 550, 553 (5th Cir. 1986); *Molina* v. *United States Fire Ins. Co.*, 574 F.2d 1176, 1178 (4th Cir. 1978); *Prince Carpentry, Inc.* v. *Cosmopolitan Mut. Ins. Co.*, 124 Misc. 2d 919, 930 (N.Y. Sup. Ct. 1984); *Guaranty Nat'l Ins. Co.* v. *Bayside Resort, Inc.*, 635 F. Supp. 1456, 1459 (D.V.I. 1986). The implication of these cases is that, as we hold, an excess policy that says without limitation that it drops down when the underlying coverage is reduced provides first dollar coverage when the primary insurer becomes insolvent and unable to make any payment on a claim. See *Fageol Truck & Coach Co.* v. *Pacific*

*Indem. Co.*, 18 Cal. 2d 748, 751-752 (1941) (coverage drops down on insolvency of primary insurer because primary coverage was "exhausted").

*Judgment affirmed.*

O'CONNOR, J. (dissenting). Reserve's limits of liability stated in the schedule of underlying insurance attached to Continental's policy are $300,000 per occurrence and $300,000 in the aggregate. Thus, it is clear from the schedule that any payment made by Reserve on account of a loss sustained by its insured reduces Reserve's maximum indebtedness to its insured on account of subsequent losses. The resulting limit of liability for subsequent losses would be less than $300,000, although the new reduced limit would not appear on the schedule. Thus, in the event of a prior indemnity payment by Reserve, Continental's promise to "indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance *stated in the schedule*" (emphasis added) would leave the insured unprotected to the extent of a new occurrence resulting in a loss that exceeds the reduced limit of Reserve's coverage but is less than the $300,000 stated in the schedule as Reserve's per occurrence limit of liability. To plug that gap, the policy provides that "if the applicable limit of liability of the underlying insurance is less than as stated in the schedule of underlying insurance because the aggregate limit of liability of the underlying insurance has been reduced this policy becomes excess of such reduced limit of liability."

The latter provision is not ambiguous. Nevertheless, the court concludes otherwise, and it bases its conclusion primarily on the following provision focusing on the insured's promise to maintain underlying insurance at certain levels of coverage: "The insured agrees that the policies listed in the schedule of underlying insurance . . . shall be maintained without alteration of terms or conditions in full effect during the currency of this policy except for any reduction of the aggregate limits of liability in the underlying insurance because of injury or destruc-

tion." The latter provision specifically refers to reduction "because of injury or destruction," while the provision setting forth Continental's promise to pay losses in excess of stated limits of liability as they may be reduced does not specifically refer to a cause or causes of reduction. From this, the court concludes that it is unclear whether Continental has promised to pay losses in excess of the underlying policy's stated limit of liability, reduced by causes other than "injury or destruction," including the underlying insurer's insolvency. In keeping with established principles, the court then resolves the perceived ambiguity in favor of the insured.

But, there is no ambiguity. An underlying insurer's aggregate limit of liability cannot be reduced except by a prior payment. Even if it could be reduced in some other way, the one fact that is critical to the resolution of this case is that the aggregate limit of liability of an insurer *cannot* be reduced by insolvency. In the absence of special terms, not present here, the insolvency of an insurer, or that of any other debtor, does not affect the amount of its indebtedness. "Liability" is simply another word for indebtedness, and a limit of liability set forth in an insurance policy is but a ceiling on its indebtedness in the event of a loss incurred by its insured. The inability of an insurer to pay its debts does not extinguish them nor lower the ceiling on its indebtedness. Therefore, it cannot rightly be said that, because of Reserve's insolvency, "the applicable limit of liability of the underlying insurance is less than as stated in the schedule of underlying insurance because the aggregate limit of liability of the underlying insurance has been reduced." The aggregate limits of Reserve's liability simply were not reduced by Reserve's insolvency. Therefore, Continental's policy did not provide first dollar coverage to the insured. Nothing in *Fageol Truck & Coach Co.* v. *Pacific Indem. Co.*, 18 Cal.2d 748, 751-752 (1941), cited by the court as supportive of its holding, suggests otherwise. Unlike the present case, the policy there did not provide coverage in excess of the limits of underlying insurance.

The court does not consider whether the words "applicable limits of liability" are ambiguous, nor whether the word

"applicable" may be interpreted as meaning "collectible." *Ante* at 599 note 2. The plaintiff argues that the word "applicable" may fairly be construed as meaning "capable of being applied" at the appropriate time for payment, and that, since no money was collectible from Reserve at that time, the limit of liability capable of being applied (applicable) was zero. That argument is without merit.

The word "applicable," modifying the words "limits of liability of underlying insurance," simply and unambiguously distinguishes the limits of liability stated in the underlying policy covering the loss from the limits of liability contained in irrelevant underlying policies. Since the insured's loss in this case arose out of a claimant's falling down on its premises, Reserve's general liability policy, including its limit of liability, covered the loss, that is, it was capable of being applied. On the other hand, use of the word "collectible" to modify "limits of liability" would make no sense. Limits of liability, that is, ceilings placed on obligations, simply are not collectible. Money is collectible, but rights and duties and limits thereon, since they cannot be gathered or received, are not "collectible" as that word is commonly understood. Collectibility of the underlying insurance proceeds, therefore, has nothing to do with establishing the "applicable limits of liability of underlying insurance." It follows that the applicable limits of liability in this case were $300,000, and not zero dollars.

The court disclaims reliance on "the concept of an insured's objectively reasonable expectations as a possible guide to the determination of an insured's rights under an insurance policy. See *Home Indem. Ins. Co.* v. *Merchants Distribs., Inc.*, 396 Mass. 103, 107 (1985), and cases cited." *Ante* at 600, n.4. Nevertheless, the court states that, "if a reasonable policyholder thought about the subject at all, it probably would have assumed that the excess insurer would step into the void whenever, for whatever reason, the primary insurance company could not or would not meet its policy obligations." *Ante* at 600-601. I do not agree.

As I have attempted to show, there is nothing in Continental's policy that even suggests an undertaking by Continental to

protect the insured from the risk of an underlying insurer's insolvency. Furthermore, there has been no showing that the "structure, content, manner of printing of the [insurance contract], or the methods and practices of marketing . . . creat[ed] reasonable expectations of a [greater area] of coverage" than is set forth in the unambiguous provisions of Continental's policy which are discussed in the court's opinion and in mine. *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 477 (1987), quoting *Davenport Peters Co.* v. *Royal Globe Ins. Co.*, 490 F. Supp. 286, 291-292 (D. Mass. 1980).

I would reverse the judgment below.